DAWSON v. DAWSON AND BOWMAN DAWSON v. DAWSON and Mr. Kalper when you're ready. Good morning, your honors. Political pundits have suggested that today this nation's electorate faces a choice between two clear alternatives. These two interferences don't present such alternatives because there's only one standard for construction of a count in an interference. The count is to be construed as broadly as is reasonable given the technology to which it is directed. Unlike a claim in patent prosecution, you don't even refer to the specification from which the language of that count is drawn to interpret its scope unless there's an ambiguity in that language. Neither party argued that there was an ambiguity in the language of the counts of interferences 105-719 and 105-729. Notwithstanding this fundamental rule that a count shouldn't be given a narrow or contrived scope, the board narrowed the count in two respects. First, the board, on the language a method to treat, confined the counts to the treatment of the remediation of an active infection in the eye. That excluded that portion of the counts in both cases that embraces prevention, prevention in a variety of situations. Second, the board said this count, this language, a method of treating the eye requires a showing of efficacy. You haven't completed the invention until you've demonstrated a remediation of the infection in the eye. That was error, your honors, and that was a material error. There's no language that supports that restrictive interpretation. This court has looked at similar language, a method for reducing hematologic toxicity, a method of treating a cancer patient, and in 2012, a method for the treatment or prevention of stroke or its recurrence. And each time this court has said that language standing alone does not import into the scope embraced a requirement for a showing of efficacy. It's a statement of intended purpose. By the same token, the language in the 729 count of an effective amount of an azolite antibiotic. What is it about the case that shows us, putting aside for a minute whether the idea was definite and permanent, and what is it that takes us out of the realm of whether it's just a research or a plan to conduct research? We would point you to three pieces of evidence that it was far more than a tentative or vague research goal, but rather a clear and definite permanent idea. First, turn to the senior party's description of Dawson's presentation to the World Health Organization. Insight, before the current interferences were declared, characterized it as a clear suggestion of using topical azithromycin to treat the eye. This is from the EPO opposition. And a concrete disclosure for using azithromycin with the vehicles in Table 1, which included Duracite. Your Honors, ideas don't get much more permanent or clear than those that are cast in concrete. If you look at the evidence of Dawson's conduct from 1997 through March of 1999, it was unwavering and persistent. He had one focus. Was the churn experiment part of Dawson's endeavor? Yes, Your Honor. We don't rely on it in the briefs here because the board stopped at conception. But Dr. Churn's experiment was meant to duplicate the effect of, or not duplicate, but present the effect of putting azithromycin in a depot as opposed to eye drops or something similar. That's the change. How do you get the azithromycin in the eye? Azithromycin was an old antibiotic. That's the genius of the invention. And that's what Dr. Churn tested. There's an argument, and we addressed it before the board, that certainly a complete reduction to practice of the 729 interference, and it's close enough to what's called for by the 719, to demonstrate that the invention worked for its intended purpose. But the board didn't get there. The board said, you've got to have this showing because it's vague. And that's just wrong. Dr. Dawson disclosed azithromycin in Duracite. He did that in 1997. From 1997 to February of 1998. And the 1997 again is the World Health Organization presentation. In 1998, he, together with Dr. Lightman, filled out a grant application for funding the Edmund Clark McDonald Foundation. And he said, in that period between 1997 and 1998, that he had been working with the chemists at Insight, and together they had come to the conclusion that azithromycin was the perfect antibiotic to work with the vehicle Duracite. There was no doubt. There wasn't a change. There wasn't variation. And your honors, we looked to the board. And bore the grant to fund? The grant to fund further research on topical, as well as systemic treatment. It had, in fact, two parts. That grant was funded. The people who read it believed it. They believed that it was research that was well worth conducting. It was specific enough to warrant funding, your honors. Right. It's not a research plan to me, though. There's nothing about research plans, your honor, that are disqualified from standing as conceptions. Sometimes our cases have described the spectrum as ranging from a complete and concrete concept of the invention versus a research plan. That's absolutely correct, your honor. But in that description, it's a research plan without a complete and concrete description. If this was a plan for further research, it was accompanied by, supported by, a concrete and specific disclosure. The only thing that was missing was that showing of efficacy. And that, we know from the board itself, wasn't a requirement for conception of these accounts. Because Dawson moved for benefit of the 165 application, which was filed March 31, 1999. That motion was opposed. The board scrutinized that 165 application and looked at the examples, particularly example four, which is the exact application of topical exithromycin that Dr. Chern did two years earlier. And the board said, this is a constructive reduction to practice. There is not a showing of efficacy anywhere in that priority application, your honors. It is error to require more by way of conception evidence than it is to require for constructive reduction of practice. Because our case law tells us that constructive reduction to practice presumes both conception and enablement. We urge this court to look at the count, the language of the count, and conclude, as we argued before the board, that there's no requirement for a showing of efficacy. And re-amend this interference for consideration of Dawson's Motion 2 in Interference 105-729, designating certain claims as corresponding to the count of that interference. And have to answer your questions or otherwise reserve the additional time for rebuttal. Very well. We'll save the remainder of your time. No questions. Thank you, your honors. Now, Mr. Freed, you had filed a cross-appeal and reserved two minutes for sir rebuttal. We have decided that the cross-appeal is not appropriate in this case, and that your issue that was raised on cross-appeal can be raised as an alternative ground in support of affirmance. But the consequence of that for present purposes is that you will be given your full 15 minutes now, but you won't be allowed to come back on this call. Understood, your honor. Understood? Very good. Thank you. And you understand, Mr. Elber, so you will have the last word. Thank you, your honors. Let me start off by saying that the idea that you don't consult the specification is, I think, new to this court. That's intrinsic evidence that I think the cases say must be considered in all circumstances, but particularly in this circumstance. The common disclosure that they copied defines treat, and by the way, treat or prevent, either one of those things, means that the conditions of application result in a retarding or suppression of the infection. So for the board not to look at that would have been error. And they did look at it, and they properly construed the claim, and therefore their entire appellate argument should fail. But regardless of what treating means or doesn't mean, the board was correct in finding that there was no sole conception by Dawson at any time prior to his collaboration with Bowman. There are two claims here, two counts. The count in the 719 interference is loaded with limitations in it that are nowhere mentioned in either the WHO document or formed any part of Tern's experiment. You can't find anything in there about 0.1 to 1% of a nasal antibiotic, 0.1 to 10% of a polymeric suspending agent, water-swellable, water-insoluble, 90% acrylic monomers, and 0.1 to 5% cross-linking agent. The board found that that wasn't there, and they were correct in that, regardless of what treating means. Now they say, well, it really was there because the word duracite was there. But the board properly found that there was no accepted definition of duracite that inherently had all that stuff in it, nor that Dawson even knew what duracite was, other than the sketchy disclosure that he put in, that was in his paper, the paper that he presented, of some generic statement about it being a carboxy-polymer or something like that. That's all he said about it. When you look at all of the WHO documents, for example, if you look at page 3990, and it deals with alternative vehicles for delivery of the topical azithromyme, the second sentence there says one obvious preparation would be an ointment, like the 5% erythromycin ointment. Isn't that pretty specific and definite? Your Honor, I have two answers to that. Number one, in the 719 count, an ointment wouldn't satisfy the 719 count. It's not water-swellable, it's not water-insoluble, it doesn't have a cross-linking agent. We need to be clear that there are two separate interferences here, and with respect to ointment, ointment cannot satisfy the count of the 719 interference. Ointment can potentially satisfy the count of the 729 interference. The 719 interference count is on page 124, it's claim 3 of the 113 patent. The 729 interference count is claim 1 of the 443 patent, and it's on record page 134. Although an ointment can satisfy that interference, but not the first interference, it's got to be an ointment that has azithromycin in it. That references to erythromycin. And the record is replete with evidence that cannot be ignored, that the board's findings are supported by substantial evidence, that there is nothing to indicate that you can translate one to the other. That's wishful thinking on their part. The board found out there were no experiments, no papers, no nothing that said you could say that everything that's true of erythromycin, which has different solubility and other kinds of things, and azithromycin is the same. So the short answer to your question after the long one is, for the count of the 719 interference, anointment is irrelevant. For the count of the 729 interference, erythromycin is not azithromycin, and the board made several findings about the deficiencies of the proof in that regard. And those findings are supported by substantial evidence, which is, according to the Supreme Court, the controlling standard here. So the 719 is the 113 claim one, is that right? 719 is claim three, your honor. Oh, claim three. Yes. Oh, right. Okay. It's on page 124. I have it. Thanks. And the 729 is on 134. It's the 443. So they're two separate claims. We have to be careful that we don't mix the two up. Now, the allegation that they're not relying on the churn activity is pretty interesting, because their brief says they're relying on churn not only for reduction of practice, but they're relying on churn as corroborative of conception. But churn doesn't corroborate conception for a variety of reasons. And they flat out say it, that they're relying on it as corroborative of conception. It doesn't corroborate conception for a number of reasons. Number one, it has nothing to do with that claim one of the count which has all those limitations that have nothing to do with churn's ointment. And it doesn't corroborate for the 729 interference for a variety of reasons found by the board. Number one, the board said, although it says it had, in this instance, erythromycin in it, I mean azithromycin in it, not erythro. It did have, supposedly, azithromycin in it. There's a label on there. No one tried to present any evidence on whether it factually had, at the time of application, any azithromycin in it, or whether that azithromycin was in it in a way that didn't wash away. The proofs are deficient in that area, totally deficient in that area. Secondly, and probably more importantly, we're not finding out whether churn had a conception, we're trying to find out whether Dawson had a soul conception. And there is no evidence in this record whatsoever that Dawson even knew about the churn activity, the churn experiment, that he had anything to do with it. I'm not saying he did or he didn't know. I'm saying on this record, you cannot make a determination that that inures to Dawson's benefit, when in fact Dawson had no idea about it. Is the opposite true? Did churn know about Dawson? Churn knew of Dawson. Isn't that what's really important? No, what's really important is whether Dawson had a conception, not whether churn might have had a conception. But even churn didn't have a conception because he wasn't trying to treat an eye. Now let's look carefully at the count in the second interference, the 729 interference. The argument that treating is just preamble is very interesting because it says, topically applying a nasolite antibiotic to an eye in amount effective to treat infection. That's in the body of the plant. It's not in the body of the other one that has all the other limitations that are missing. But in this one, where anointment could satisfy, it says it has to be in there in amount effective to treat infection. Churn specifically testified, on his own, that he wasn't trying to treat infection. All he was trying to find out is if his eye could tolerate this. So even if it was Churn's conception that we could look at, which we can't, because it's got to be Dawson's conception. Something that Dawson doesn't know about can't in work to Dawson's sole benefit. You're not suggesting, are you? Maybe you are. I'll ask. That Dr. Churn had to have an eye infection before this experiment of his had any significance? No, he had to have a conception of something that was going to treat an eye infection. But why then did he bother to have this substance cooked up that had an antibiotic in it if he did not anticipate that it would be ultimately used for treating eye infections? This is one of your arguments that I found I completely whiffed on. Well, I see you don't think it passes the red face test, but let me tell you why I think it does. Churn did nothing other than... by Dr. Dawson, go to Lyle Bowman and see if he could help him create something. And he did. On his own, he wanted to know if somebody gets this thing, are people going to be able to tolerate something in an eye? But what he has in mind, presumably, all the way along is why are they going to be putting it in their eye? Well, they're going to be putting it in their eye to treat this disease. That's the underlying common denominator. I'm not denying that. But the claim calls for an amount effective to treat. He didn't care whether it was effective or not effective at this point in time. He cared whether it was tolerated. He wasn't even concerned with the amount effective to treat. He didn't even know what the amount was because somebody else put it in there. That was the point. Not that ultimately there wasn't going to be a treatment somewhere along the line. But that's part and parcel of the board's correct decision that an idea is only... And this is under your cases. This is from the in vitrogen case. An idea is only sufficiently definite and permanent to be complete when there is a settled particular solution and not just a general goal. If you read that WHO document, there is nothing settled about that document at all. Just a bunch of questions. This might work, be a good idea to look at. If you even get to the churn experiment, which again Dawson didn't know about, or at least on this record he didn't know about, there's nothing settled. It's okay, let's see about this, whether it will be tolerated. Nothing settled about what's going to do the job. You have to settle on the way it's going to be reduced to practice. No one settled on the way it was going to be reduced to practice. So what do you say about the EPO evidence? Well, the first thing I say about the EPO evidence is that there's very little in the record about it. And as the board pointed out, this interference involves conception of two particular kinds of claims. Two particular claims. The claim that was at issue in the EPO, to the extent you could tell from the very sparse record on this, was a totally different claim. So even if there was something that could have satisfied to be a conception of the claim that was involved in the EPO, and I'm not saying it was, that's not the claim that's involved here. Secondly, the issue in front of the EPO, as the board pointed out, was novelty. And maybe their version of obviousness. But those concepts are not the same as conception that are involved in interference. Or at least there's no record here that points out to the similarities. No information was presented whatsoever on whether the EPO policy or precedent are even the same as the ones we apply here. No information was presented on the EPO's rationale in resolving the opposition or what effect this alleged admission had on the ultimate outcome. We don't even know the result. We know that there's a selected statement pulled out of a quote in a document submitted by Insider on behalf of Insider, I believe, that was an admission that is relevant, if at all, to different claims than the ones involved here on a different issue than the ones involved here. That's what I have to say about the EPO. And under this court's own precedent question, it's admissible. All right. But it's an admission. It's an admission of your party. Anything that a party does in states that's inconsistent with the position they're taking now is an admission that's admissible, yes. It doesn't have to be inconsistent with a position. I do believe that the definition of admission means that it has to be different from the position of other states. It's a statement of a party in the lawsuit. Well, either way, the board let it in. The board did not consider it. It just said it doesn't prove anything. And they're right. It doesn't prove anything. It proves absolutely nothing in this case. We don't know what was being admitted, how it's relevant to what should be decided here. Totally different claim on a totally different issue. Regarding what was termed the cross-appeal and is now part of my alternative grounds for affirmance, before I get to that, I have one other observation to make. Two minor ones. There was a statement about the submission to the funding. That formed a lot of part of the record below. And it's a statement in the statement of facts. But it was not relied on for conception in the briefs. And therefore, we moved to strike it because it was put on only in the rebuttal brief and not in the original brief. So I have a Rule 2070 motion pending in the context of my brief is where I briefed the motion on that. I'll leave that alone, but I wanted to mention that. So on the issue of the appeal, what we have the alternative ground, the board misapplied the statute. No one disagrees that there's a nexus that has to be made before you can get a priority benefit. The issue here is if they don't get the priority benefit, they're dead under 135B and 102. No one argues that either. So if they don't get the priority benefit, the case is over on patentability. To get the priority benefit, they have to satisfy the nexus of 120. In no uncertain terms, 120 says that that benefit happens only when the earlier application was filed by the inventor. Their reliance on SIMED proves our point, not theirs. SIMED was dealing with 119, which had a totally different point in it. The point being, it could be on behalf of or by. The board specifically said they based their finding on an on behalf of. This statute does not permit an on behalf of. And it wasn't really on behalf of Dawson anyway, because Dawson said he didn't want anything to do with it. He was asked. He declined to participate. Very well. If you have nothing further, I think we have no further questions. You're actually expired. I thought so. That's what it looked like to me. Yeah, that's what it is. It is as it appears. Fortunately, I didn't expire. Yeah. We can only argue or appeal from the decision that the board provided us. The board didn't separate these interferences. The board said, you got one problem. You didn't show it works. Respectfully, your honors, that's not part of our doctrine. Interference is a funny business. Many people are saying, thankfully, we don't have to worry about it anymore. But in fact, this court's decision in Nova Farm is probably the high water discussion of that phenomenon. To have conception, you just have to know how you want it to be applied. You don't have to show it works. This is evidence. 1997, August 4, Dr. Leiter testified what's in here. Dr. Chern testified why he wanted it prepared. Because he wanted to do what Dawson said to do in 1997. And that is compare the 0.5%, 005%, azithromycin vehicle in a depot with erythromycin. Azithromycin was known. Would it behave properly in a depot? Could you tolerate it? That's why it's corroborative. Dr. Chern testified, based on documents that are in the record, that he first asked Lyle Bowman to do this. Why Lyle Bowman? Because Lyle Bowman had access to Duracite. Duracite was the same in 1995, when the first patent application mentioned it, as it was in 1999, as it is today. Refresh me as to what the connection between Dr. Chern and Dawson is. Dr. Dawson was a senior faculty member at UCSF, as a joint foundation there. Dr. Chern was a fellow there. Dr. Chern was working with Dr. Lakeman at the time on azithromycin resistance. I got all that. But what I missed is the connection between Dr. Chern and Dr. Dawson. Well, Dr. Chern was invited to work on Dr. Dawson's idea, Dr. Dawson's request. That's why Dr. Dawson told him to go to Lyle Bowman. When that avenue didn't work out, Chern consulted the other person he knew that was an expert at formulation. Leiter. Leiter or Lightman? No, Lightman is Chern's co-fellow at Leiter. It is a problem. Leiter was, and remains today, an expert pharmacologist making things that are not off the shelf. And that's why Chern, who, because of his own research, had azithromycin, sent it to Leiter, just like he did to Bowman, and said, could you make this for me? Why? Because I want to test it. And what was the test? The test was putting an effective amount, and Chern testified that it would have been effective, putting an effective amount of azithromycin in a depot in his eye. Now, this doesn't contain duracyte. I will grant you that. But our law is replete with circumstances where for an actual reduction to practice, you can simulate the conceived of invention. And this is a darn good simulation. That's what Dr. Leiter testified. What does Chern serve here? Does it serve as proof of reduction to practice? Does it corroborate the conception of the idea by Dawson back in 97, before the who? What is it that Chern, what's the role of Chern? I guess I would answer your question by saying yes, Your Honor. We originally presented it, because of the way interferences are structured, as an actual reduction to practice. The board said, we don't get there. We care only about conception, and you lacked conception. For that purpose, Chern is clearly corroborative. To go back to my earlier question about the relationship between Chern and Dawson, I understand the relationship between Chern and Bowman, but it wasn't clear to me, other than the fact that they're working in the same field and the same institution, that Dawson put Chern up to this experiment. That was Dr. Chern's testimony, that Dawson told him... That Dawson told him to do this experiment? Yes, Dawson told... I'm sorry, Your Honor, I didn't mean to talk over you. No, no, no, I was talking over you. But I just didn't make sure I understand it, because if that's in the record, I missed it. I'm sorry, Your Honor. Dawson told... Chern testified, it's in Chern's declaration. So Chern said... Dawson told Chern. Once Chern had said, yes, I want to be involved in this project, Dawson told Chern, go to Lyle Bowman at InSight. I'm sorry. Dawson told Chern, go to Lyle Bowman at InSight. Right. Because Dawson had worked with Bowman in the past. Okay, but it wasn't Dawson who put Chern up, as I understand it, to make this formula and put it in his eye. That was Bowman and Lightman, right? Well, to make the formula itself, yeah. Chern is not a pharmacologist. He's an eye doctor. Right. He wanted to get... Dawson said, get this made. Let's try it. Because that was Dawson's idea. Where in the record is that? Where in the record? It's Dr. Chern's declaration. Okay. Well, if it's in the declaration, we'll find it. So that's fine. Sorry, Your Honor. That's fine. Thank you. Thank you. I'm sorry, any further questions? No. Thank you. Very well. Thank you, and we thank both counsel. The case is submitted. And we thank you, Ms. Connell. Thank you, Your Honor. The order of the court is adjourned until tomorrow morning at 10 o'clock.